**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| FAYSAL SALIM MUHAMMAD | : | |
| | : | |
| Appellant | : | No. 1224 WDA 2019 |

Appeal from the Judgment of Sentence Entered July 11, 2019
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0002604-2018

BEFORE: BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED JANUARY 13, 2021**

Appellant Faysal Salim Muhammad appeals from the judgment of sentence following a jury trial and convictions for attempted homicide, aggravated assault, and other related offenses.[1]  Appellant asserts that the trial court erred in admitting unfairly prejudicial testimony of his identity and challenges all of his convictions based on insufficient evidence identifying him as the shooter.  We affirm.

We adopt the facts and procedural history set forth in the trial court's opinion.  **See** Trial Ct. Op., 11/18/19, at 1-15.  On July 11, 2019, the trial court sentenced Appellant to an aggregate sentence of twenty-four to forty-

_____

[1] **See** 18 Pa.C.S. §§ 901(a), 2501(a), 2701(a)(1), 907(b), 6105(a)(1), 6106(a)(1).

eight years' imprisonment. Appellant did not file a post-sentence motion but timely appealed. Appellant timely filed a court-ordered Pa.R.A.P. 1925(b) statement and amended statement.[2]

Appellant's amended Rule 1925(b) statement asserted that the Commonwealth failed to present sufficient evidence to convict him of the above crimes. Am. Rule 1925(b) Statement, 10/14/19, at 2 (unpaginated). Among other items, Appellant claimed that the trial court erred by admitting the testimony of corrections officers under Pa.R.E. 403. *Id.* at 3 (unpaginated). The trial court filed a responsive opinion on November 18, 2019.

Appellant raises the following issues, which we reordered for ease of disposition:

> 1. Whether the trial court abused its discretion in permitting testimony relating to the identification of . . . Appellant that was contrary to the protections of Pennsylvania Rule of Evidence 403?
>
> 2. Whether the Commonwealth failed to present sufficient evidence and testimony to prove beyond a reasonable doubt . . . Appellant's guilt of criminal attempt-criminal homicide, aggravated assault, possession of a weapon, possession of a firearm prohibited, and firearms not to be carried without a license?

Appellant's Brief at 4.

_____

[2] Appellant filed a motion for permission to file an amended Rule 1925(b) statement, which the trial court granted on September 24, 2019. Appellant timely filed an amended Rule 1925(b) statement on October 14, 2019.

In support of his first issue, Appellant argues that the trial court abused its discretion by admitting evidence in violation of Pennsylvania Rule of Evidence 403. *Id.* at 18. Specifically, Appellant objects to the testimony from Officers Johnston and Bolt about how they recognized him. *Id.* at 19-20. In Appellant's view, the testimony, although relevant, was "unfairly prejudicial and outweighed the probative value of such." *Id.* at 21. "Appellant argues that the testimony offered by the corrections officers was unfairly prejudicial as it gave the jurors unnecessary pieces of information that easily could have been used to connect the dots that the witnesses knew . . . Appellant because he was incarcerated." *Id.* Appellant suggests that the Commonwealth could have limited the scope of its questions to only his identification or "presented an actual witness to the shooting that was able to identify" him." *Id.* (emphasis omitted).

> With respect to the admissibility of evidence:
>
> the admissibility of evidence is within the sound discretion of the trial court and we will not reverse absent an abuse of discretion. . . . . An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.
>
> Relevance is the threshold for admissibility of evidence; evidence that is not relevant is not admissible. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. Our Rules of Evidence provide the test for relevance: evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact

is of consequence in determining the action. Further, the court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

*Commonwealth v. Leap*, 222 A.3d 386, 390 (Pa. Super. 2019) (citations omitted and formatting altered), *appeal denied*, 233 A.3d 677 (Pa. 2020); *see also* Pa.R.E. 403.

Here, we initially note that Appellant waived this issue by withdrawing his initial objection at trial and by failing to object on the specific basis he now raises on appeal concerning the Commonwealth's examination of Officers Johnston and Bolt.[3] Moreover, even if Appellant objected to the subject examination at trial, we would affirm on the basis of the trial court's reasoning. *See* Trial Ct. Op. at 15-16.

_____

[3] *See* N.T. Trial, 5/14/19, at 77. Pennsylvania Rule of Evidence 103 provides that in order to preserve an evidentiary issue for appellate review, a party must timely object and state "the specific ground, unless it was apparent from the context." Pa.R.E. 103(a)(1)(B); *see also* Pa.R.A.P. 302(a). Instantly, initially Appellant objected to any mention of "him being previously incarcerated in Erie County." N.T. Trial, 5/14/19, at 74. After discussion, the Commonwealth agreed to instruct Officers Johnston and Bolt from testifying that Appellant was an inmate, and Appellant's trial counsel said, "[t]hat's fine." *Id.* at 77. Appellant therefore did not preserve his objection for appellate review. *See* Pa.R.E. 103 (requiring a party to timely object in order to preserve evidentiary issue for appellate review); Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal"); *Commonwealth v. Lopez*, 57 A.3d 74, 81-82 (Pa. Super. 2012) ("If counsel states the grounds for an objection, then all other unspecified grounds are waived and cannot be raised for the first time on appeal" (citations omitted)).

Second, Appellant challenges the sufficiency of evidence for his attempted homicide conviction. Appellant's Brief at 9. Appellant argues that the Commonwealth did not "present any witness that could positively identify" him as the shooter. *Id.* at 9. Appellant highlights, in his view, testimonial discrepancies regarding identifying features. *Id.* For example, Appellant claims that the only eyewitness testified that the shooter "had a lot of hair," but Detective Sean Bogart testified that Appellant's hair appeared "shorter" or a "low haircut" in the surveillance video. *Id.* at 10. Appellant emphasizes that Detective Bogart did not see a firearm in his hand. *Id.* Appellant acknowledges he was identified in the video, but was not explicitly identified as the shooter. *Id.*

Our Supreme Court has explained the standard for reviewing the sufficiency of the evidence as follows:

> We must determine whether the evidence admitted at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports all of the elements of the offense beyond a reasonable doubt. In making this determination, we consider both direct and circumstantial evidence, cognizant that circumstantial evidence alone can be sufficient to prove every element of an offense. We may not substitute our own judgment for the jury's, as it is the fact finder's province to weigh the evidence, determine the credibility of witnesses, and believe all, part, or none of the evidence submitted.

*Commonwealth v. Cooper*, 941 A.2d 655, 662 (Pa. 2007) (citations omitted). "Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is

- 5 -

plenary." **Commonwealth v. Williams**, 176 A.3d 298, 305 (Pa. Super. 2017) (citation omitted).

"In addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes." **Commonwealth v. Smyser**, 195 A.3d 912, 915 (Pa. Super. 2018) (quotation marks and citation omitted). If a defendant challenges only the sufficiency of evidence as to identity, then we limit our review solely to that element. **See Commonwealth v. Cain**, 906 A.2d 1242, 1244 (Pa. Super. 2006) (declining to address the sufficiency of evidence supporting every element where a defendants challenged only identification evidence). We add:

> Evidence of identification need not be positive and certain to sustain a conviction. Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight.

**Commonwealth v. Kinney**, 157 A.3d 968, 971 (Pa. Super. 2017) (citation omitted).

After careful consideration of the parties' briefs, the record, and the trial court's opinion, we affirm the sufficiency of evidence supporting Appellant's convictions on the basis of the trial court's opinion. **See** Trial Ct. Op. at 17-

- 6 -

19; ***see generally Kinney***, 157 A.3d at 971.  We therefore affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/13/2021

COMMONWEALTH OF PENNSYLVANIA     :     IN THE COURT OF COMMON PLEAS
                                 :     OF ERIE COUNTY, PENNSYLVANIA
                                 :
            v.                   :     CRIMINAL DIVISION
                                 :
FAYSAL SALIM MUHAMMAD,           :
            APPELLANT            :     NO. 2604 of 2018

## OPINION

This matter is before the Court on Appellant's Amended Statement of Matters Complained of on Appeal. For the reasons set forth below, the judgment of sentence should be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 15, 2019, following a jury trial, Appellant, Faysal Salim Muhammad, was convicted of Criminal Attempt/Criminal Homicide, Aggravated Assault, Possessing Instruments of Crime, Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms, and Firearms Not to Be Carried Without a License.[1]

The convictions arose from Defendant's actions in shooting Clifton Barney in the head outside the Ultra View Lounge, a bar located at the 400 block of Plum Street, Erie, Pennsylvania, at approximately 2:44 a.m. on June 9, 2018. Barney sustained loss of his right eye, blindness in his left eye, and other serious and permanent injuries due to the shooting. As discussed more fully herein, an extensive police investigation of video surveillance from cameras mounted inside and outside the bar led to the identification of Defendant as the shooter.

On July 11, 2019, Appellant was sentenced to an aggregate of 24 to 48 years of incarceration as follows.[2]

---

[1] 18 Pa.C.S.A. §§901(a)/2501(a), 2702(a)(1), 907(b), 6105(a)(1), and 6106(a)(1), respectively.
[2] See *Sentencing Order; Transcript of Proceedings, Sentencing Hearing of July 11, 2019 (Tr. Sent.), pp. 12-14.*

> Count One: Criminal Attempt/Criminal Homicide – 20 years to 40 years of incarceration, consecutive to any sentence currently being served;
>
> Count Two: Aggravated Assault – 6 ½ years to 13 years of incarceration, concurrent with Count One;
>
> Count Three: Possessing Instruments of Crime – 1 year to 2 years of incarceration, consecutive to Counts One and Two;
>
> Count Four: Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms – 4 years to 8 years of incarceration, concurrent with Count Three; and
>
> Count Five: Firearms Not to Be Carried Without a License – 3 years to 6 years of incarceration, consecutive with Counts Three and Four.

The sentences were within the standard ranges of the sentencing guidelines.

No post-sentence motions were filed. On August 9, 2019, trial counsel, Charles K. Sunwabe, Jr., filed a Notice of Appeal. The Court issued a 1925(b) Order on August 12, 2019 and on August 23, 2019, a Concise Statement of Matters Complained of on Appeal was filed. On September 17, 2019 the Court granted trial counsel's motion to withdraw his representation of Appellant. On September 24, 2019, Attorney Emily M. Merski entered an appearance on behalf of Appellant. On September 25, 2019, the Court granted appellate counsel's petition for leave to file an amended statement of matters complained of on appeal within 21 days. On October 14, 2019, Appellant timely filed an Amended Statement of Matters Complained of on Appeal.

Paraphrased and re-ordered for clarity, Appellant raises the following issues for appellate review:

> 1. Appellant claims evidentiary error occurred in admitting the identification testimony of Adam Johnston and Shawn Bolt;
>
> 2. Appellant challenges the sufficiency of the identification evidence at all Counts;

2

3. Appellant claims the Commonwealth failed to produce any evidence of motive at Counts One and Two; and

4. Appellant claims the sentence was excessive and unreasonable.

The issues shall be addressed *ad seriatim*.

## EVIDENTIARY REVIEW

The relevant evidence presented by the Commonwealth is summarized herein. No evidence was introduced on behalf of Appellant.

### 1. City of Erie Police Detective Michael Gould

The Commonwealth presented the testimony of Detective Gould who, together with his partner, on June 11, 2018, initially recovered video surveillance from approximately ten outside cameras at the Ultra View Lounge at the intersection of Fourth and Plum Streets in Erie Pennsylvania on June 9, 2018 from 2:30 to 3:00 a.m. Detective Gould subsequently recovered additional video surveillance, this time from both the outside and approximately ten additional inside cameras, for an expanded period of time, from 11:00 p.m. on June 8, 2018 to 3:00 a.m. on June 9, 2018. Tr. Day 1, 18-29. Most of the cameras operated properly. Tr. Day 1, p. 29. Gould downloaded the video onto a thumb drive for the police. Tr. Day 1. P. 30. A series of surveillance video exhibits was admitted into the record as Commonwealth Ex. A. Tr. Day 1, p.p. 30-31.

### 2. City of Erie Police Officer Michael Brady

Officer Brady a third shift supervisor, worked on June 8, 2018 from 10:00 p.m. until June 9, 2019 at 6:00 a.m. At the relevant time, Brady was monitoring activity at the Ultra View

Lounge from his patrol vehicle from approximately a block and one-half from the bar, due to increased activity at the bar. Tr. Day 2, pp. 4-7, 23. At approximately 2:30 a.m. he heard a single "pop": what sounded to him like a gunshot or a firework. Tr. Day 2, pp. 7-8. A minute later, he received the report of a shooting victim in the area. Tr. Day 2, p. 8. Brady drove to the bar. The police recovered a single Luger 9 mm. shell casing. Brady took photographs of the area, including photographs of the shell casing and fresh blood spatter and pooled blood, collectively admitted into the record as Commonwealth Exs. B through P. Tr. Day 2, pp. 10-18, 22. The casing was located by the curb, next to the rear passenger side of a white vehicle parked under a tree. Tr. Day 2, pp. 17-20. Commonwealth Q, an overhead view of the intersection of Fourth and Plum Streets, was admitted into the record. Tr. Day 2, p. 12. Commonwealth Ex. Q is another photo of the shell casing. Tr. Day 2, p. 21.

### 3. Gregory Beard, M.D.

The Commonwealth presented the testimony of Gregory Beard, M.D., Medical Director of the trauma unit and surgical critical care unit at UPMC Hamot, regarding records of treatment of Clifton Barney at UPMC Hamot on June 9, 2018, admitted at Commonwealth Ex. S. Barney arrived at the hospital at approximately 3:11 a.m. and was treated for altered mental status and a gunshot wound which obliterated Barney's right eye, damaged the sinuses in the face and bruised the right side of his brain. CAT scan images revealed bullet fragments in the right frontal lobe; cerebral hemorrhage/bruising of the brain; fragments through the sinuses and left side of the face; and a large bullet fragment on the left side of the face. The path of the bullet appeared to be through Barney's right eye and eyelid, through the sinuses of the face, across the base of the skull on the inside of the face, ending in the jaw line on the left side. Tr. Day 2, pp.

4

25-31. Barney was transferred to UPMC Presbyterian Hospital in Pittsburgh, Pennsylvania for surgical treatment. Tr. Day 2, p. 31.

**4. City of Erie Police Detective Sean Bogart, Lead Investigator**

The Commonwealth presented the testimony of City of Erie Police Detective Sean Bogart. Tr. Day 2, pp. 33-129. Detective Bogart is with the Major Crimes Unit of the City of Erie Police and began his investigation on June 9, 2018 at 8:00 a.m. Tr. Day 2, pp. 33-35. Detective Bogart's extensive testimony is summarized thus.

The Ultra View Lounge was the scene of prior violent crimes, including a double shooting in October of 2017 and a homicide in April of 2017. Tr. Day 2, p. 37. With regard to the double shooting, witnesses were uncooperative and police were left to rely on video surveillance evidence in prosecuting the case. Tr. Day 2, p. 37.

Bogart's testimony established that similarly, no witnesses were forthcoming in this case and there was a complete dearth of assistance from any persons who could be interviewed as to the identity of Barney's shooter. The 911 call for the shooting of Barney was received at 2:44 a.m. A number of persons were in the area at the time of the shooting. Bogart interviewed Antoinette Holmes who advised she was with Barney inside the bar for a couple of hours before the shooting; she was outside when the shooting occurred; and she could not identify a suspect. Although Bogart interviewed a number of other persons who were at the bar, he was unable to obtain a statement that would provide a lead to a possible suspect. Tr. Day 2, pp. 36-37, 40.

The police were left with the complicated task of piecing together the events of late evening and early morning from video captured by surveillance cameras on the interior and exterior of the bar. Bogart arranged for Detective Gould to recover the video from those

surveillance cameras. Bogart analyzed the video surveillance and saw that it captured the shooting. Tr. Day 2, pp. 37-39.

Excerpts of the video surveillance were played for the jury during Bogart's testimony. As video was played, Bogart narrated it and explained the course his investigation took, as matters captured on film were revealed.

Video footage from exterior cameras mounted on the east side of the building, with each camera facing Plum Street at a different angle, depicted the following, keeping in mind the 911 call for the shooting of Barney came in at 2:44 a.m.

1. Video marked as Commonwealth Ex. A-3, filmed by an exterior camera at 2:43:52, depicts people on the street including the person later identified as Defendant. Tr. Day 2, pp. 40-42. A white vehicle passes in front of Defendant. Tr. Day 2, p. 59. Defendant is seen crossing Plum Street, and walking southbound on the sidewalk. Defendant approaches Barney who is standing, facing the street. Though a firearm is not visible, the video depicts evidence of a shooting, a flash, and then shows Barney falling into the street. Tr. Day 2, pp. 40-42. When the flash appeared, there were no others in the immediate area of the shooting, other than Defendant and Barney. Tr. Day 2, p. 60. In his affidavit, Bogart described this section of the video as portraying: "The subject walks behind the victim and appears to remove a firearm from the waist area and there's a flash on scene." Tr. Day 2, pp. 113-114. The shooter, who was standing at the back of a SUV when the shot was fired, ran off in a southbound direction. Tr. Day 2, pp. 42-43. The video depicts the shooter was wearing lighter colored blue jeans; a shirt with a logo on the back; and a darker shoe with white soles. Tr. Day 2, pp. 121-122. Bogart testified that only one shell casing was recovered in the investigation; it was found just in front of the SUV. Tr. Day 2, p. 43.

6

2. Video marked as <u>Commonwealth Ex. A-9</u>, from a different angle at the same time period, shows the same white vehicle pulling into view. Tr. Day 2, p. 44. A person later identified as Defendant walks behind the vehicle and crosses Plum Street to the east side of the street. Notably, from this angle, the Defendant is seen wearing a very specific T-shirt: the shirt has the letters "RR" on the back, and a design; a large print on the front of the shirt; a tag on the sleeve or a writing; and a square tag on the left front of the shirt. Tr. Day 2, pp. 44, 59. The only persons in the immediate area of the shooting are Barney and a female. At this angle, no others are in view of the camera. As Defendant leaves the street and walks up onto the curb and yard, it appears as though he lifts his shirt up a bit. Tr. Day 2, pp. 57-58. Barney is viewed falling into the street, and Defendant can be seen running away, southbound on Plum Street. Tr. Day 2, pp. 45, 58-59. Barney is placed into a vehicle for transport to the hospital. Tr. Day 2, p. 43.

3. Video marked as <u>Commonwealth Ex. A-10</u> depicts a person later identified as Defendant on the outside of the bar, as he approaches the camera. Defendant is seen exiting a black Chevy SUV from the rear passenger seat on the driver's side. Without interacting or speaking with anyone, Defendant walks south on Plum Street, along the sidewalk. As Defendant approaches the camera, some facial features are apparent. Noteworthy aspects of Defendant's clothing are: Defendant is wearing the same white T-shirt depicted in other videos; the T-shirt has "Rock Revival" lettering; the tag on the left lower; and the arm tag or band on the arm. This is where the "RR" from the other camera angle picks up. Tr. Day 2, pp. 50-51, 56. The video from Camera 10 is not the video used to identify Defendant's face. Defendant is seen looking both north and south. Tr. Day 2, p. 53.

On the corner there were two additional exterior cameras. Only one of these cameras, Camera 11, faced the proper direction and provided any useful information. Camera 11 was a

color camera and faced the intersection of Fourth and Plum Streets and an entrance/exit of the Ultra View. The video excerpt from this camera is marked as Commonwealth Ex. A-11. Tr. Day 2, pp. 51-52. Details of the distinctive outfit worn by the person later identified as Defendant are apparent on this video: the T-shirt with the tag on it, the design on the back of the neck of the shirt, and the pattern on the right sleeve of the shirt; blue jeans with obvious coloration; and darker shoes with white soles. Tr. Day 2, pp. 51-52, 55. The police were unable to identify the persons who were in the vehicle with Defendant. Tr. Day 2, pp. 51-52. The video was re-wound or backed up by several seconds, and Bogart testified it depicts three persons, including the Defendant, exiting the bar from the north entry/exit door. Tr. Day 2, pp. 55-56. The individuals are seen looking south on Plum at 2:43 a.m., in the direction where Barney was standing, as depicted in another video. Tr. Day 2, pp. 55-56. Later in his testimony, Bogart clarified that when Defendant left the bar for the last time he momentarily entered the passenger side of the black Chevy SUV, the same vehicle he had arrived in; he exited the vehicle; and he headed on down the sidewalk. Tr. Day 2, p. 123. The shooting occurred at 2:44 a.m., a minute after the individuals are seen looking south on Plum, in the direction of Barney. Tr. Day 2, p. 56.

From the external video surveillance cameras, the police determined the shooter came from inside the bar, went to his vehicle momentarily, then shot Barney outside the bar. Utilizing this information, the police then worked "backwards" and analyzed video from cameras mounted inside the bar. Tr. Day 2, p. 60.

Interior video depicts Barney inside the bar wearing a Champion T-Shirt with grey and white, leaning against a wall. Tr. pp. 63-64. Interior Camera 2 provided the police with video footage of the person inside the bar whose outfit and general description matched that of the shooting suspect, later identified as the Defendant. Tr. Day 2, pp. 60-61. The police took screen

8

shots or still images of the suspect from the portion of video which depicted most clearly and in the best lighting the suspect's face and the T-shirt he wore with its distinctive markings and features, as the Defendant hesitated. Tr. Day 2, pp. 63-64.

Next, in an effort to identify the suspect, Bogart disseminated the still shots, marked as Commonwealth Ex. T, to patrol officers and law enforcement agencies, including the Erie County Prison. Tr. Day 2, p. 64. Shortly thereafter, Bogart received a response from Major Gary Seymour from the Erie County Prison advising that two guards, Shawn Bolt and Adam Johnston, were able to identify the suspect. They identified the suspect as Faysal Muhammad, utilizing photographs from the prison and comparing them with the screen shots which Bogart had disseminated. Tr. Day 2, pp. 65-66.

Bogart conducted separate interviews of Bolt and Johnston on June 13, 2018, and showed them the actual internal video clips from which the still shots had been taken. Each person independently identified Defendant from those clips, based upon prior interactions with Defendant. Tr. Day 2, pp. 96-97. After Bolt and Johnston identified Defendant, Bogart filed the instant charges. Tr. Day 2, p. 97. As Bogart was unable to locate Defendant, an arrest warrant was issued. Several weeks later, Defendant was found by marshals in Detroit, Michigan and arrested. City of Erie Police Officers Lennox and Russell brought Defendant back to Erie. Tr. Day 2, p. 99.

Referencing once again the exterior video marked as Commonwealth Ex. A-11, Bogart testified this video shows Defendant arrived at the bar in a black Chevy SUV at 12:28 a.m. on June 9th. Tr. Day 2, p. 66. The vehicle was headed west on 4th Street and parked along the curb. Five persons, including Defendant in his distinctive attire, exited the vehicle at 12:35 a.m. Tr. Day 2, p. 67. Defendant and a male companion from the vehicle wearing a black shirt entered

9

the bar through the north entrance at 12:36 a.m. Tr. Day 2, pp. 67-68, 72, 78. The other three remained outside. Tr. Day 2, p. 71.

Bogart reviewed video surveillance from inside and outside the bar from 11:00 p.m. to the point of Defendant's arrival at approximately 12:30 a.m. and observed no one wearing the same shirt, or same jeans with the same fade and distinctive rips, or same dark shoes with white soles as the Defendant wore. Tr. Day 2, p. 69. Similarly, from 2:44 a.m, the time Defendant ran off, until 3:00 a.m., Bogart saw no person on video from inside or outside the bar with the same distinctive shirt, jeans with fade and rips, and black and white shoes. Tr. Day 2, pp. 69-70.

From the time Defendant and his companion entered the bar at 12:36 a.m. until 2:37 a.m., the last time Defendant is seen inside the bar, video surveillance depicts Defendant moving about, and walking in and out of view of the camera, wearing the same outfit. No one else was dressed in the same attire during that period. Tr. Day 2, pp. 78-91. In some interior views, the pattern on Defendant's T-shirt and the "RR" marking on the back of the neck of the shirt are particularly distinct. Actually, one of the R's is reversed as part of the logo. Tr. Day 2, pp. 56, 89-90.

Bogart testified that at 2:42 a.m., approximately three minutes before the shooting, surveillance video from Exterior Camera 11 depicts Defendant exiting the bar and entering the rear driver's side passenger compartment momentarily, then walking south on Plum Street. Tr. Day 2, p. 92. At this juncture, video surveillance from Exterior Camera 9, which captured the shooting close-up, was played again for the jury. Tr. Day 2, p. 93.

Based upon his review of the surveillance videos, Bogart described the shooter as a black male with medium skin color, between 25 and 30 years old; five feet and ten inches to six feet and two inches tall; with a medium to heavier build. Tr. Day 2, p. 70. While surveillance video

10

of Defendant inside the bar at Commonwealth Ex. A-2 was placed in "pause" mode, Bogart testified he recognized the person in the video was the Defendant, who was present at trial. Tr. Day 2, pp. 86-88. Bogart also identified the suspect in the surveillance videos from the exterior building cameras as Defendant. The hairline of the suspect in the interior videos is consistent with the suspect's hairline as depicted in the exterior videos. Tr. Day 2, p. 88. The hairline of the suspect in the videos is also consistent with Defendant's hairline as it appeared at trial. Tr. Day 2, p. 91.

Bogart compared still images of Defendant and his attire created from video from exterior surveillance cameras with still images of Defendant captured from video from interior surveillance cameras, and determined the images were consistent. Tr. Day 2, pp. 94-96.

The investigation revealed no credible motive for the shooting. Tr. Day 2, p. 71. The police were unable to recover the black Chevy SUV. Tr. Day 2, pp. 100-103. The weapon used to shoot Barney was not recovered. Tr. Day 2, p. 113. Results from DNA and fingerprint testing of the shell casing did not produce evidence of the identity of the shooter. Tr. Day 2, p. 128.

Defendant did not have a valid license to carry a firearm and did not have a valid sports and firearm permit. Tr. Day 2, pp. 97; Commonwealth Ex. Y. The parties stipulated Defendant did not have the right to possess a firearm at the relevant time. Tr. Day 2, pp. 98-99.

## 5. Clifton Barney, the Victim

The Commonwealth presented testimony of Clifton Barney, summarized herein. Barney does not know who shot him. He denied having an argument with anyone the night before he was shot. He denied having significant health issues before the shooting. Due to the shooting he sustained loss of the right eye and is blind in the left eye. The bullet entered his face in the

11

corner of an eye, and remains lodged in his head. He received medical treatment in Pittsburgh, Pennsylvania, due to the shooting; most recently he underwent shoulder surgery. Tr. Day 2, pp. 46-49.

## 6. City of Erie Police Officer Jason Russell

The Commonwealth presented testimony of City of Erie Police Officer Jason Russell, summarized herein. On August 29, 2018, Officer Russell and his partner traveled to Detroit, Michigan to pick up Defendant, who was already in custody there, and bring him back to Erie. Tr. Day 2, pp. 147.

## 7. Adam Johnston, Erie County Prison

The Commonwealth presented the identification testimony of Adam Johnson, summarized herein. Tr. Day 2, pp. 129-138. Adam Johnston has worked at the Erie County Prison for 15 years. Through his employment he periodically receives notices asking if he recognizes someone. In the past three or four years he has received 20 to 30 such notices. Up until June of 2018 he was unable to recognize a person whose picture was sent to him in a notice. Tr. Day 2, p. 130.

In June of 2018, Johnston received another notice by e-mail asking if he recognized someone. He clicked on the picture, marked as Commonwealth Ex. T, immediately recognized the person in the photo, and called his supervisor, the Major of Security, Gary Seymour. Johnston informed Seymour he believed the person in the photo was Faysal Muhammad. Tr. Day 2, pp. 130-131.

12

Next, Johnston called a co-worker, Officer Bolt. Without suggesting the reason, or mentioning Defendant's name, Johnston told Bolt to check his e-mail and to call him back. About 15 minutes later, Bolt called Johnston back. Bolt also called Seymore. Tr. Day 2, pp. 132-133.

Subsequently, Johnston met with Detective Bogart who showed Johnston the photograph of Defendant marked Commonwealth Ex. T, and the video from which the photographic image was taken. Tr. Day 2, p. 133. Johnston's level of confidence was very high the person depicted in the photograph and video was Defendant. At trial, Johnston testified:

> Q: Were you confident when you only saw the still image?
>
> A: Yes.
>
> Q: How confident are you?
>
> A. Very confident.
>
> Q: And when you see this video, did that shake your confidence in any way?
>
> A. If it could increase, it did. But I don't know if it could have.
>
> Q: Okay. And did you tell Detective Bogart that?
>
> A; Yeah, immediately.

Tr. Day 2, pp. 134-135.

The basis for Johnson's identification of Defendant was Johnston's familiarity with Defendant for approximately six months through Johnston's work. During that six-month period, Johnston had daily contact with Defendant and spoke with him at least two or three times per day. The conversations were sometimes face-to-face, with eye contact. Tr. Day 2, pp. 135-137.

13

## 8. Shawn Bolt, Erie County Prison

The Commonwealth presented the identification testimony of Shawn Bolt, summarized as follows. Tr. Day 2, pp. 138-144. Shawn Bolt is an employee at the Erie County Prison. Throughout his career he has received e-mails asking him to identify a person in a photo. Until June of 2018, Bolt had never been able to identify anyone. Tr. Day 2, p. 138.

In June of 2018, Bolt received a telephone call from Officer Johnston asking if Bolt had seen the email from the Major of Security. Johnston provided no more detail or information than that. Bolt was unaware of the reason Johnston wanted him to look at his e-mail. Tr. Day 2, pp. 139, 142.

Bolt opened the e-mail and looked at the picture. Bolt recognized the person, called Johnston, and relayed this to Johnston. Next, Bolt called Major Seymour and advised him the person in the photo was Faysal Muhammad. Bolt recognized the Defendant as Faysal Muhammad. Tr. Day 2, pp. 139-140.

The image at Commonwealth Ex. T was the photo which accompanied the e-mail from Major Seymour. Tr. Day 2, p. 140.

Within one or two days, Bolt met with Detective Bogart who showed Bolt the photograph. Bogart also showed Bolt the video marked as Commonwealth Ex. A, which Bolt had not previously viewed. Bolt recognized the person in the video was Faysal Muhammad. Tr. Day 2, p. 141. Bolt's level of confidence was extremely high the person depicted in the photo and the video was Faysal Muhammad. At trial, Bolt testified:

> Q: When you first see these still frames in the e-mail, how confident are you?
>
> A: 100 percent confident.

14

Q: When you see this video now or this still frame of the individual moving around, does that change your confidence level?

A: No, sir.

Tr. Day 2, pp. 141-142.

The basis for Bolt's identification of Defendant was Bolt knew and recognized the Defendant through work. Bolt had face-to-face conversations with Defendant at a distance of two or three feet over a couple of months. Tr. Day 2, pp. 142-143. When Bolt was shown the photo of Defendant, Bolt did not know Defendant was a shooting suspect. Tr. Day 2, pp. 143-144.

## DISCUSSION

### I. Claims of Evidentiary Error: Testimony of Adam Johnston and Shawn Bolt

Appellant claims abuse of discretion and/or legal error occurred in permitting Corrections Officers Adam Johnston and Shawn Bolt to testify at trial regarding their identification of Appellant. Appellant claims the testimony was inadmissible pursuant to Pa.R.E. 403 because "the probative value of such [was] unfairly prejudicial." *1925(b) Statement, ¶9.*

#### A. Legal Standards

The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. *Commonwealth v. Antidormi*, 84 A.3d 736, 749 (Pa. Super. 2014).

> An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. An abuse of discretion may result where the trial court improperly weighed the probative value of evidence admitted against its potential for prejudicing the defendant.

*Commonwealth v. Antidormi*, 84 A.3d at 749 (internal citations and quotation marks

15

omitted).

Pennsylvania Rule of Evidence 403 provides the Court may exclude relevant evidence if its probative value is outweighed by a danger of unfair prejudice. *See Pa.R.E. No. 403.* Relevant evidence is that which has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. *See Pa.R.E. 401.* "'[U]nfair prejudice' means 'a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.'" *Castellani v. Scranton Times, L.P.,* 124 A.3d 1229, 1245 (Pa. 2015). *See also, Pa.R.E. 403 (comment).*

All relevant Commonwealth evidence is meant to prejudice a defendant. *See Commonwealth. v. Gonzalez,* 112 A.3d 1232, 1238 n.6 (Pa. Super 2015). Thus,

> [e]vidence is not unfairly prejudicial simply because it is harmful to the defendant's case. The trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand. Exclusion of evidence on the grounds that it is prejudicial is limited to evidence so prejudicial that it would inflame the jury to make a decision based on something other than the legal propositions relevant to the case.

*Commonwealth v. Flamer,* 53 A.3d 82, 88, n. 7 (internal quotations and citations omitted).

### B. Discussion

Neither Officers Adam Johnston's nor Shawn Bolt's identification testimony unfairly prejudiced Appellant because the testimony did not "suggest decision on an improper basis or divert the jury's attention away from its duty of weighing the evidence impartially. Their identification of Appellant was relevant to weight, not admissibility, and the jury was free to believe or disbelieve this testimony which was subject to cross-examination by the defense at trial. Any prejudicial effect of Johnston's and/or Bolt's identification testimony was

16

insignificant. The Court was not required to sanitize the trial by excluding relevant identification testimony of Johnston and/or Bolt. No abuse of discretion occurred in admitting this evidence. There was no overriding or misapplication of the law, or exercise of judgment that was manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. The claims are wholly without merit and must be dismissed.

## II. Sufficiency of Evidence Claims – Identification Evidence

Appellant challenges the sufficiency of the identification evidence at all counts. *1925(b) Statement, ¶8.*

### A. Sufficiency of the Evidence Standard

When evaluating a challenge to the sufficiency of the evidence, the Court must determine whether, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, together with all reasonable inferences from that evidence, the trier of fact could have found each element of the crime charged was established beyond a reasonable doubt. *Commonwealth v. Hargrave,* 745 A.3d 20, 22 (Pa. Super. 2000), *appeal denied,* 760 A.2d 851 (Pa. 2000)(internal citations omitted); *Commonwealth. v. Brunson,* 938 A.2d 1057, 1058 (Pa. Super. 2007); *Commonwealth v. Chambers,* 599 A.2d 630, 633 (Pa. 1991). The Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence. *Commonwealth v. Hopkins,* 747 A.2d 910, 913 (Pa. Super. 2000). The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence, and any questions or doubts are to be resolved by the fact-finder, unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *Commonwealth v. Hopkins, supra* at 913-14.

## B. Discussion

Viewing the evidence against this standard, Appellant's claims of insufficiency of the identification evidence are meritless and must be dismissed. The identification evidence clearly established it was Appellant who committed the crimes.

The police recovered video surveillance from numerous cameras mounted on the interior and exterior of the bar. The lead investigator, Detective Sean Bogart from the City of Erie Police, analyzed the exterior video surveillance films and observed that it captured the shooting. Tr. Day 2, pp. 37-39.

Bogart's analysis of the surveillance videos revealed that, from various distances and angles, the interior and exterior videos collectively depicted a person later identified as Defendant, wearing distinctive clothing engaging in various activities inside and outside the bar. The videos show the person in the distinctive attire exiting the bar, and within minutes stopping briefly at the vehicle he arrived in, exiting the vehicle, and heading down the street in the direction of Barney. Video depicts this person as he approaches Barney and appears to reach for something within his clothing. Video next depicts a flash, with Barney falling into the street and the Defendant fleeing on foot. The videos showed the individual dressed in the distinctive attire was the same individual who shot Barney.

No one else in the numerous videos at the relevant times was wearing the same distinctive clothing. Bogart sent screen shots of the person wearing this attire out to law enforcement. The screen shots were taken from video surveillance from within the bar shortly before Defendant exited the bar and shot Barney. Two separate corrections officers/employees who viewed the screen shots independently identified the person in the close-up as Defendant.

At trial, the two corrections officers, Johnston and Bolt, testified about the bases for their independent identifications of Defendant, and their high levels of confidence in the accuracy of their identifications. Following identification of the shooter as the Defendant, Faysal Muhammad, Bogart filed the instant charges. Defendant, who had fled the scene and subsequently the state, was later arrested in Detroit, Michigan, and brought back to Erie, Pennsylvania to face the instant charges.

During the three-day trial, the Commonwealth presented the testimony of various witnesses, including that of the lead investigator, City of Erie Police Officer Detective Sean Bogart. Detective Bogart, *inter alia*, testified concerning the video surveillance films he reviewed while excerpts of the films were played for the jury. The Commonwealth also presented the testimony of the two corrections officers, Adam Johnston and Shawn Bolt, who independently identified Defendant from screen shots from surveillance video from the bar.

Collectively, this evidence established Defendant was the perpetrator of the crimes at Counts One through Five. The claims are meritless and must be dismissed.


## III. Claims of Error – Evidence of Motive

Appellant challenges the convictions at Count One, Criminal Attempt/Homicide, and Count Two, Aggravated Assault, on the basis the evidence was insufficient because the Commonwealth did not present evidence of motive. The claims are unavailing. The Commonwealth was not required to present evidence of motive at Counts One and Two because motive is not an element of the crimes the Commonwealth was required to prove. *See 18 Pa.C.S.A. §§901(a)/2501(a), 2702(a)(1).* Evidence to prove motive is always relevant in criminal cases. *Commonwealth v. Gwaltney,* 442 A.2d 236, 241 (Pa. 1982). While proof of a

19

motive for the commission of a crime is always relevant, it is not an essential element and is not necessary to warrant a conviction. *Commonwealth v. DePetro*, 39 A.2d 838, 840 (Pa. 1944); *Commonwealth v. Manchas*, 633 A.2d 618, 623 (Pa. Super. 1993).

## IV. Sentencing Claim

In the 1925(b) Statement, Appellant baldly claims the trial court "relied on impermissible factors in fashioning the Appellant's sentence and thereby sentenced the Appellant to a sentence that is excessive and unreasonable." *1925(b) Statement, ¶ 10.*

### A. Claim Waived as Vague

In the 1925(b) Statement, Appellant failed to identify where in the sentencing record the court relied upon an impermissible factor; failed to identify any considered factor which was arguably "impermissible"; and failed to identify how, in any respect, the sentence was excessive or unreasonable. *See 1925(b) Statement.* Appellant fails to articulate any basis for the claim. For lack of specificity in the 1925(b) Statement, the Court is impeded in its review of the issue, and the claim is waived for vagueness. *See 1925(b)(4)(ii).*

Assuming *arguendo* the claim is not waived as vague, it is wholly without merit.

### B. Legal Standards and Discussion

#### 1. Claim Not Preserved

Assuming *arguendo* the claim is not waived, it presents a challenge to the discretionary aspects of his sentence. "Challenges to the discretionary aspects of sentencing do not entitle appellant to review as of right." *Commonwealth v. Allen*, 24 A.3d 1058, 1064 (Pa. Super. 2011). Therefore, before an appellate court will rule on the discretionary aspects of a sentence Appellant must satisfy a four-part test. *See Commonwealth v. Austin*, 66 A.3d 798, 808 (Pa. Super. 2013).

20

The issue must be properly preserved by timely presenting the issue in either a post-sentence motion or at time of sentencing, and be included in a Pa.R.A.P. § 2119(f) statement. *Commonwealth v. Tobin*, 89 A.3d 663, 66 (Pa. Super. 2014) (citations omitted). Further, an appeal is permitted only after the appellate court determines there is a substantial question that the sentence is not appropriate under the Sentencing Code. *Id.*

As no post-sentence motion was filed, and no claim regarding the sentence imposed was raised at time of sentencing, this claim was not properly preserved for appellate review.

**2. Claim Meritless - No Substantial Question Raised**

In the event the Superior Court wishes to address the sentencing claim, no substantial question has been raised. "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Glass*, 50 A.3d 720, 727 (Pa. Super. 2012) (citations omitted). The appellate court does not accept bald assertions of sentencing errors. *Commonwealth v. Malovich*, 903 A.2d 1247, 1252 (Pa. Super. 2006) (citations omitted). "Rather, Appellant must support his assertions by articulating the way in which the court's actions violated the sentencing code." *Id.*

Appellant's bald assertion of sentencing errors fails to raise a substantial question. Appellant advanced no colorable argument any sentence imposed was inconsistent with a specific provision of the Sentencing Code. Nor did Appellant indicate how any sentence was contrary to any fundamental norm underlying the sentencing process. As no substantial question was raised, the sentencing claim must fail.

21

## 3. Claim Meritless - No Abuse of Discretion

Assuming, *arguendo*, a substantial question has been raised, no abuse of discretion occurred in sentencing Appellant. The standard of review for a discretionary challenge to a sentence is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Raven*, 97 A.3e 1244, 1253 (Pa. Super 2014) (citation omitted).

Further, "the record as a whole must reflect the sentencing court's consideration of the facts of the crime and character of the offender." *Commonwealth v. Crump*, 995 A.2d 1280, 1283 (Pa. Super. 2010) (citation omitted). Additionally, when "the trial court has the benefit of a [PSI] report, we presume that the court was aware of relevant information regarding the defendant's character and weighed those considerations along with any mitigating factors." *Commonwealth v. Seagraves*, 103 A.3d 829, 842 (Pa. Super. 2014).

Here, the Court appropriately relied upon the pre-sentence investigative report; the Court considered the remarks of counsel; and the sentencing transcript reflects the factors the Court appropriately relied upon when fashioning the sentence. *See Transcript of Proceedings, Sentencing Hearing (Tr. Sent.), pp. 5-15.* No abuse of discretion occurred in sentencing Appellant. The sentencing claim is meritless.

22

## CONCLUSION

For the foregoing reasons, this appeal must be dismissed. The Clerk of Courts is hereby directed to transmit the record to the Superior Court.

BY THE COURT:

11/15/2019
**Date**

Daniel J. Brabender, Jr., Judge

cc:    District Attorney's Office
        Emily M. Merski, Esq., Office of the Public Defender

23